**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Robyn Melissa Kain,

Plaintiff,

Civ. No. 10-1740 (RHK/JJK)
**MEMORADNUM OPINION AND ORDER**

v.

City of Eden Prairie, *et al.*,

Defendants.

---

Daniel C. Guerrero, Meshbesher & Spence, Ltd., Minneapolis, Minnesota, for Plaintiff.

Stephanie A. Angolkar, Jon K. Iverson, Iverson Reuvers, Bloomington, Minnesota, for Defendants.

---

## INTRODUCTION

Plaintiff Robyn Kain spent the evening of November 19, 2009, drinking at a friend's birthday party in St. Paul, Minnesota. Around midnight, she took a cab to her townhome in Eden Prairie, but was unable to get inside because she did not have the key. She then asked a friend to kick down the front door so she could enter. Kain's neighbors heard the noise and, fearing a burglary, called police. Responding officers entered the townhome and arrested Kain, not knowing who she was; once they realized their mistake, they released her. In the course of being arrested, however, Kain sustained a deep laceration that required stiches. She later commenced the instant action against the City of Eden Prairie (the "City") and two of its police officers, Jesse Irmiter and Robert Davis,

alleging *inter alia* violations of her Fourth-Amendment rights. Defendants now move for summary judgment. For the reasons set forth below, the Court will grant their Motion.

## BACKGROUND

Most of the relevant facts are not in dispute; where disputed, they are recited in the light most favorable to Kain. See Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000).

Kain purchased the townhome in question in April 2007. (Kain Dep. at 7.) In mid-2009, she fell behind on the monthly payments and enlisted a realtor to assist in finding a buyer. (Id. at 9-10.) At about that time, she began staying at her boyfriend's house on weekends. (Id. at 7-8.)[1] On the front door knob of the townhome, Kain had hung a lockbox containing a key, which was sometimes used by the realtor; the lockbox was opened using a push-button code. (Id. at 12-13.)

On Thursday, November 19, 2009, Kain spent the day working and then drove to a friend's birthday party at a St. Paul restaurant. (Id. at 20-21.) Over the course of approximately five hours, she consumed a glass of wine and "four to five" "tall glasses" of rum and Diet Coke. (Id. at 21.) Because she was, in her words, "probably drunk" (id. at 29), she gave her keys to a friend and took a cab to her townhome. (Id. at 23-24.) She intended to use the lockbox to gain entry once she arrived. (Id. at 23.)

[1] In her deposition, Kain testified inconsistently as to where she was living on the date in question. Although she first testified that she did not move out of the townhome until the end of November 2009 (Kain Dep. at 7), she later testified that her "home" on November 19, 2009, was her parents' house in Inver Grove Heights (id. at 20). There is no dispute, however, that several of Kain's neighbors believed that she no longer resided in the townhome on the night the incident occurred. (See Bezanson Aff. ¶¶ 5, 17; Angolkar Aff. Ex. B.)

Unbeknownst to Kain, however, her realtor had changed the lockbox, and the new box required a magnetic swipe card to open. (Id. at 13, 15.) When she arrived by cab, she could not open the lockbox. (Id.) She then used her cell phone to call a friend (Jennifer Conrad) who lived nearby; Conrad was asleep and her boyfriend, Antonio Madrigal, answered. (Id. at 25.) He told Kain she could have the cab drop her off at Conrad's condominium. (Id.)

Once Kain arrived, Madrigal told her that she should simply spend the night at Conrad's place, but Kain insisted that he bring her back to the townhome and help her get inside. (Id. at 25-26; Madrigal Aff. ¶¶ 4-5.) He agreed and drove Kain back to the townhome. (Kain Dep. at 26-27; Madrigal Aff. ¶ 6.) There, she used a hammer to try to break open the lockbox, without success. (Kain Dep. at 26-27.) She next tried to kick in the door, again without success. (Id. at 27.) She then asked Madrigal to kick in the door. (Id.) He did so, and in the process the door fell into the townhome. (Id. at 32.) The two went inside and righted the door, locking the deadbolt to hold it in place. (Id.) At approximately 1:00 am, Madrigal left and drove home, and Kain went upstairs to her bedroom and immediately fell asleep. (Id. at 32-34.)

Meanwhile, several of Kain's neighbors had heard the pounding on Kain's door and observed Kain and Madrigal attempting to kick it open; they called 911 to report a burglary. (Angolkar Aff. Ex. B.) While en route, officers were advised that a man and a woman had been kicking the door of Kain's townhome, which the neighbors believed was vacant. (Id. Exs. B, D-E; Kain Dep. at 55-56.) Officers were also advised that the

man had left in a white SUV and that the female was inside the townhome. (Kain Dep. at 56; Angolkar Aff. Ex. E; Davis Dep. at 14.)

The individual defendants here, Officers Irmiter and Davis, were the first to arrive at Kain's townhome complex. They could not initially figure out which townhome was Kain's because the door had been replaced in the doorframe. (Irmiter Dep. at 17; Davis Dep. at 15-16.) As a result, they located the persons who had called 911, who identified the townhome in question and confirmed the information that had been provided to the officers by dispatchers (including the belief that the townhome was vacant). (Irmiter Dep. at 17-18; Davis Dep. at 16-18.) The officers then approached the front door to Kain's townhome, where they found fresh splinters on the ground and footprints on the door. (Irmiter Dep. at 19; Davis Dep. at 18-19.) They radioed other officers to set up a perimeter around the townhome. (Irmiter Dep. at 20-21.)

The officers then announced their presence and, receiving no response, pounded on the townhome door to get the attention of anyone inside. (Irmiter Dep. at 21; Davis Dep. at 21-22.) The door then fell into the townhome. (Irmiter Dep. at 21; Davis Dep. at 21-22.) Irmiter, who had his police canine Brix with him, announced that he had a dog and loudly warned that he would release Brix if the person inside did not come out. (Irmiter Dep. at 22-23; Davis Dep. at 23-24.) When no one came forward, he released Brix into the townhome. The dog walked upstairs, disappeared from view, and returned approximately 20 seconds later. (Irmiter Dep. at 26.) Brix did not bark or growl, and officers heard no scream or any other audible response to Brix's presence. (Id. at 26-27.)

The officers then decided to enter the townhome, and Irmiter released Brix a second time. (Id. at 27; Davis Dep. at 24-25.)

When the officers stepped into the entryway, they observed Kain near the top of the staircase. (Kain Dep. at 34; Irmiter Dep. at 27; Davis Dep. at 25-26.)[2] Kain saw four officers, who began screaming commands at her to get down on the ground and put her hands in the air. (Kain Dep. at 36.) Kain, "out of utter scaredness," could only muster the words, "No, you don't understand. I did this." (Id.) It is undisputed that she failed to comply the officers' repeated commands to get on the ground. (Id.)

Irmiter then climbed the stairs with Brix and, three or four steps from the top, the dog "came at" Kain. (Id.) It bit her right arm, and she reflexively began to turn to her left. (Id. at 36-37.) Irmiter then grabbed her right arm, pulled her to the ground, and handcuffed her. (Id. at 37-38, 44.) In the process, Kain hit her head on the staircase wall. (Id.) Davis then made sure no one else was present on the top floor, after which Irmiter lifted Kain by the handcuffs and "threw [her] face down" on her couch in the loft, at the top of the stairs. (Id. at 38, 41.) There, officers noticed that her head was bleeding.[3]

Kain then informed the officers that they had made a mistake and that the townhome was hers. (Id. at 42.) After confirming that she resided there, the officers

---

[2] It is unclear exactly where Brix was located at this time, but at some point the dog returned to Irmiter.

[3] At times in her deposition, Kain appeared to suggest that Irmiter intentionally slammed her head into the wall. (See, e.g., Kain Dep. at 37 (Irmiter "pushed me in the corner of the wall"); id. at 50 ("[T]he police smashed my head on the wall.").) Yet, she later clarified that she simply hit her head on the wall when Irmiter "tackled" her. (See id. at 44 ("The officer tackled me from behind . . . and my head caught the wall on the corner."); id. at 64 ("Q: And as you went to the floor, your head hit the wall? A: Yes."); see also Pl. Mem. at 5 ("When Officer Irmiter pulled Ms. Kain's arm, her head hit the wall with great force . . . .").)


removed her handcuffs and called paramedics. (Id. at 42, 46-47.) Although she sustained only contusions from Brix's bite, the cut on her forehead required stitches and left a 1-1/2 inch scar that she labels "horribly disfiguring." (Id. at 60-61; Angolkar Aff. Ex. H.)

Kain later commenced the instant action against the City and Irmiter and Davis in their individual and official capacities. She asserted three claims in her Complaint: unreasonable search, in violation of the United States and Minnesota Constitutions (Count I); excessive force, in violation of the United States Constitution (Count II); and negligence (Count III). Defendants have now moved for summary judgment, and Kain has abandoned several of her claims by failing to address them in her moving papers or at the Motion hearing. See, e.g., Hassan v. City of Minneapolis, Civ. No. 04-3974, 2006 WL 2583182, at *5 (D. Minn. Sept. 1, 2006) (Frank, J.), aff'd, 489 F.3d 914 (8th Cir. 2007). All that remain for resolution are her Fourth Amendment excessive-force and unlawful-entry claims against the officers, in their individual capacities.

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves, 229 F.3d at 721; Calvit v. Minneapolis Pub.

Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

Defendants argue that they are entitled to qualified immunity on Kain's claims. In analyzing that assertion, the Court must conduct a two-part inquiry. First, it must assess whether the facts alleged, when viewed in the light most favorable to Kain, show that the challenged conduct violated a constitutional right. If a violation could be established based on those facts, the Court must then determine whether the constitutional right at issue was clearly established on the date in question. E.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004).[4] For the reasons set forth below, the Court determines that Kain has failed to establish a violation of her constitutional rights.

### I. Unlawful search

The Court begins its analysis with Kain's unlawful-search claim. It is well-established under the Fourth Amendment that "[p]olice officers may not enter or search a home without a warrant unless justified by exigent circumstances." United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996) (quoting Payton v. New York, 445 U.S. 573, 589 (1980)). Here, the officers did not obtain a warrant before entering Kain's home.

---

[4] The Supreme Court held in Pearson v. Callahan, 129 S. Ct. 808 (2009), that this two-step inquiry, which emanated from the seminal case of Saucier v. Katz, 533 U.S. 194 (2001), is "no longer . . . mandatory." Id. at 818. Rather, courts are now free (but are not required) to skip the first step and proceed directly to whether the constitutional right at issue was clearly established when the alleged violation occurred. Id.

Nevertheless, they argue that exigent circumstances – namely, their belief that a burglary was occurring – justified their entry. The Court agrees.

In Creighton v. Anderson, 922 F.2d 443 (8th Cir. 1990), the Eighth Circuit adopted the six-factor test in Dorman v. United States, 435 F.2d 385 (D.C. Cir. 1970) (*en banc*), for determining whether exigent circumstances exist. Those factors are: (1) the seriousness of the alleged offense; (2) whether there is reasonable belief that the suspect is armed; (3) whether there is a clear showing of probable cause to believe that the suspect committed the alleged offense; (4) whether there is strong reason to believe that the suspect is on the premises; (5) the likelihood that the suspect will escape if not swiftly apprehended; and (6) whether entry may be made peaceably.[5] These factors, however, are intended to serve as a "guideline, rather than an absolute test for the presence of exigent circumstances, because such a determination ultimately depends on the unique facts of each controversy." United States v. Jones, 635 F.2d 1357, 1361 (8th Cir. 1980); accord Dorman, 435 F.2d at 392.

The Dorman factors strongly support a finding of exigent circumstances here. Kain acknowledges that burglary "typically is seen as a serious offense" (Pl. Mem. at 15), and indeed, in most circumstances it is a felony under Minnesota law, see Minn. Stat. § 609.582, and typically is viewed as a "crime of violence," see Minn. Stat. § 624.712,

[5] Dorman also noted another important factor – the time of entry – although that factor "works in more than one direction." 435 F.2d at 393. "On the one hand, . . . the late hour may underscore the delay (and perhaps impracticability) of obtaining a warrant, and hence serve to justify proceeding without one. On the other hand, the fact that an entry is made at night raises particular concern over its reasonableness, and may elevate the degree of probable cause required." Id. (citation omitted).

subd. 5; U.S.S.G. § 4B1.2(a)(2). There was clearly probable cause for the officers to believe that a burglary had been committed, given that they were informed (by several witnesses) that two persons had been seen kicking the door in the middle of the night, and when the officers approached the residence, they found splinters and footprints on the door, which fell in when Irmiter pounded on it. The officers also had strong reason to believe that at least one person was still inside, based on the reports from neighbors. And as for the last Dorman factor, "it suffices to say that the entry was in fact made peacefully." Creighton, 922 F.2d at 448.[6]

Kain argues that several of the Dorman factors suggest the absence of exigent circumstances. She points out that officers had the townhome surrounded, making it "impossible for the alleged suspect to escape." (Pl. Mem. at 15.) Of course, just because officers had established a perimeter around the building does not mean that whomever was inside was guaranteed to be captured, particularly in the darkness of the middle of the night. It is not as though hundreds of officers were on the scene – by all accounts, there may have been a half-dozen officers there. Simply put, capture was by no means a virtual certainty. Kain also argues that the offense here was not "serious" because the officers were advised that the townhome was vacant. (Id.) But the officers had no way to know whether that information was accurate – in fact, it was not. Moreover, vacancy

[6] Kain contends that the entry was not "peaceable" because Irmiter had to "pound" on the door – which was deadbolted – before it fell in. (Pl. Mem. at 15.) But there does not appear to be any dispute that Irmiter pounded on the door to gain the attention of the person(s) inside, not to break it down. Under these circumstances, the officers' entry was "peaceable." See, e.g., United States v. Mendoza, No. 10-1141, 2011 WL 109011, at *2 (2d Cir. Jan. 13, 2011).

cuts both ways; while it might lessen the risk inherent in a burglary, it also reduces the Fourth Amendment protection the owner receives. See United States v. Agrusa, 541 F.2d 690, 697 (8th Cir. 1976) ("[P]remises which are vacant at the time searched are . . . less protected constitutionally than are occupied premises."). The Court's task under the Fourth Amendment is to "balanc[e] the need for the particular search against the invasion of personal rights that the search entails." United States v. Williams, 477 F.3d 974, 975 (8th Cir. 2007) (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)). Property entitled to less constitutional protection, therefore, requires a lesser showing of exigent circumstances to justify a search.

Regardless, even if the Court were to accept Kain's arguments, she has, at most, showed that one or two Dorman factors weigh in her favor. But the exigent-circumstances determination is not a simple balancing test, with the party placing more Dorman factors on one side of the scale declared the victor. Rather, the Court must analyze this issue flexibly, taking into account all of the circumstances confronting the officers. See United States v. Leveringston, 397 F.3d 1112, 1116 (8th Cir. 2005); Jones, 635 F.2d at 1361. At bottom, the question is whether there existed an "urgent need" that "justif[ied]" a warrantless entry, Dorman, 435 F.2d at 391, and the touchstone of that determination is the reasonableness of the officers' conduct. Leveringston, 397 F.3d at 1116; see also United States v. Singer, 687 F.2d 1135, 1144 (8th Cir. 1982) ("It is only 'unreasonable' searches and seizures that the fourth amendment forbids."), adopted in relevant part, 710 F.2d 431, 432 (8th Cir. 1983) (*en banc*).

It is perhaps not surprising, therefore, that courts routinely find exigent circumstances where officers have responded to a call of a burglary in progress, as it "would defy reason to suppose that [the officers] had to leave the area and secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested." Id.; accord, e.g., United States v. McCullough, 457 F.3d 1150, 1164 (10th Cir. 2006) ("[O]ur sister circuits appear to unanimously agree, and reasonably so in our view, that an officer may lawfully enter a residence without a warrant under the exigent circumstances exception when the officer reasonably believes a burglary is in progress.") (citations omitted); United States v. Harris, 62 F. App'x 738, 739 (8th Cir. 2003) (*per curiam*) (unpublished) (noting the existence of exigent circumstances where officers "need[ed] to determine if a burglary was in progress . . . and if anyone was inside"). The key case cited by Kain to support her claim, Untied States v. Zuber, 899 F. Supp. 188 (D. Vt. 1995), is distinguishable on this basis alone, as it did not involve officers responding to a burglary. Moreover, Zuber found no exigent circumstances because, *inter alia*, officers (i) had several days' advance notice of a drug transaction, during which they could have – but did not – seek a warrant, and (ii) "were fully aware it was unlikely the Defendant would escape with . . . drugs if he was not immediately arrested." Id. at 195. Here, by contrast, the officers responded to emergency calls of an ongoing burglary, in the middle of the night. These circumstances, in this Court's view, justified their entry into Kain's townhome without a warrant.

For these reasons, Kain has failed to establish a violation of her Fourth-Amendment rights. Accordingly, the officers are entitled to qualified immunity on the unlawful-entry claim.[7]

## II.     Excessive force

Kain also argues that Irmiter used excessive force when arresting her.[8] It is beyond peradventure that the Fourth Amendment precludes the use of excessive force by law-enforcement officers. E.g., Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005). The question to be answered, therefore, is whether the force used here exceeded the quantum constitutionally permissible.

As with all Fourth-Amendment claims, answering this question turns on the "objective reasonableness" of Irmiter's conduct. Graham v. Connor, 490 U.S. 386, 392 (1989); Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006). Under that standard, the Court must evaluate the facts and circumstances surrounding the use of force, "including the severity of the crime at issue, whether the [plaintiff] pose[d] an immediate threat to the safety of the officers or others, and whether [the plaintiff] . . . resist[ed] arrest or attempt[ed] to evade arrest by flight." Samuelson, 455 F.3d at 875 (internal quotation marks and citation omitted). Put another way, determining the

---

[7] In light of the foregoing, the Court need not analyze the alternative – and in the Court's view, correct – argument that the officers were permitted to enter the townhome as part of their "community caretaking functions," United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006), an argument to which Kain has not responded. See, e.g., Singer, 687 F.2d at 1144 (no Fourth-Amendment violation where officer entered private residence "as part of his routine community caretaking functions, *which include responding to notice of what appeared to be a burglary in progress*") (emphasis added).

[8] Although the Complaint asserts the excessive-force claim against both Irmiter and Davis, Kain has clarified in her brief that she brings this claim against Irmiter alone. (See Pl. Mem. at 7-13.)

reasonableness of the force used requires the Court to "evaluate the totality of the circumstances," "careful[ly] balancing of the nature and quality of the intrusion on [Kain's] Fourth Amendment interests against the countervailing governmental interests at stake." Copeland v. Locke, 613 F.3d 875, 881 (8th Cir. 2010) (citations omitted). This inquiry is an objective one, "without regard to [Irmiter's] underlying intent or motivation." Samuelson, 455 F.3d at 875-76 (citation omitted). Moreover, the "'reasonableness' of [the] use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citation omitted). The Court must be mindful that "officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force . . . necessary." Id. at 397.

The Court has little trouble concluding that the amount of force employed here was not constitutionally excessive. There is no dispute that the officers, believing a burglary was in progress, announced their presence at Kain's home and received no response. There is no dispute she failed to comply with their repeated commands to get down on the ground once she appeared at the top of the staircase. See, e.g., Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006) ("When a suspect is passively resistant, somewhat more force may reasonably be required."); Greiner v. City of Champlin, 27 F.3d 1346, 1355 (8th Cir. 1994) ("When an arrestee flees or resists, some use of force by the police is reasonable."). And there is no dispute that officers were unaware at the time of the incident that Kain resided in the townhome; in their minds, she was a burglary suspect. Simply put, the severity of the "crime," combined with the "tense, uncertain,

and rapidly evolving" situation at hand – the middle of the night, facing a non-compliant burglary suspect, when officers did not yet know whether others were present in the townhome – permitted Irmiter to use more than minimal force to secure Kain's arrest. Accordingly, his initial conduct – advancing upon Kain with a dog, which bit her – did not constitute unreasonable force under the circumstances. Indeed, Kain does not appear to rely on the dog bite to support her claim, pointing instead to Irmiter's actions in taking her to the ground, "mashing" her head into the wall in the process. (See Pl. Mem. at 11 ("[T]ackling or pulling Ms. Kain into a wall constituted unreasonable force.").)[9]

Moreover, once Brix bit Kain, she turned to her left, away from Irmiter. While Kain's reaction to a biting dog is understandable "in the peace of [this] judge's chambers," Samuelson, 455 F.3d at 875, Irmiter's *interpretation* of her conduct must be evaluated from the perspective of a reasonable officer on the scene, in the heat of the moment, and not with the benefit of hindsight. In the Court's view, Irmiter was justified in viewing Kain's actions – turning toward the top of the stairs, away from the officer – as further resistance. See, e.g., Wertish, 433 F.3d at 1066 (officers could reasonably interpret plaintiff's failure to comply with commands to exit vehicle as resistance, despite fact that he was suffering diabetic seizure). And the Court further concludes that Irmiter met Kain's added "resistance" with an appropriately measured response: grabbing her

[9] The dog bite caused only *de minimis* injury; Brix's teeth did not break Kain's skin and only caused contusions. (See Angolkar Aff. Ex. H.) Hence, it would not support an excessive-force claim in any event. See, e.g., Wertish, 433 F.3d at 1067 ("[R]elatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were *de minimis* injuries that support a conclusion that [the defendant] did not use excessive force."); Andrews, 417 F.3d at 818 ("[A] *de minimis* . . . injury is insufficient to support a finding of a constitutional violation.").

arm and pulling her to the ground. See, e.g., id. (yanking plaintiff out of car and taking him to ground not excessive force when plaintiff failed to comply with officer commands to exit vehicle); see also Curd v. City Court of Judsonia, Ark., 141 F.3d 839, 841 (8th Cir. 1998) (noting that grabbing plaintiff forcefully by arm and turning her body was only a "limited amount of force").

The Court finds Kain's excessive-force claim similar to the one considered and rejected by the undersigned in Herr v. Peterson, __ F. Supp. 2d __, 2010 WL 4720262 (D. Minn. Nov. 16, 2010). There, SWAT officers executing a search warrant at night encountered the unarmed, smaller female plaintiff exiting her bedroom. The officers grabbed her and threw her to the ground, then kneeled on top of her, handcuffed her, and dragged her down the hall to another room. She sustained neck and back injuries as a result of the officers' actions. Nevertheless, this Court found the officers' use of force was not excessive under the circumstances. Id. at *5-6. Similarly here, Irmiter encountered Kain, a smaller female, in the middle of the night. He reasonably believed she was a burglary suspect, and she failed to comply with his commands and then turned away from him when he advanced on her. Under these circumstances, Irmiter was justified in taking Kain to the ground to handcuff her. The resulting injury to her head does not transform Irmiter's conduct into excessive force.[10]

---

[10] Citing Watkins v. City of Oakland, 145 F.3d 1087 (9th Cir. 1998), Kain argues that Irmiter cannot justify his use of force by relying on her "resistance" in turning away from Brix. Watkins is distinguishable, however, because there was no disobedience by the suspect in that case before the dog bit him. Here, by contrast, Kain had repeatedly ignored the officers' commands before being bitten. Therefore, Kain's action in moving away from Irmiter could reasonably be viewed as further non-compliance or an attempt to escape.

Kain's arguments to the contrary are not persuasive. She contends that "the primary evidence" of excessive force is that Irmiter was more than twice her size and, hence, he could have "easily subdued [her] by simply holding her arm." (Pl. Mem. at 11.) Yet, she overlooks that Irmiter had no way to know whether (i) she was armed or (ii) other persons were present in the townhome, and she also overlooks that she had repeatedly failed to comply with the officers' commands to get down on the ground. In the Court's view, this authorized Irmiter to immediately take her down on the staircase to handcuff her. See Herr, 2010 WL 4720262, at *5-6 (officers justified in taking much smaller plaintiff to the ground despite fact that she offered no resistance).

Kain further argues that "Irmiter knew that she did not have any weapons *in her hands*." (Pl. Mem. at 10 (emphasis added).) Yet, Irmiter need not have assumed that she posed no threat simply because he saw no weapon in Kain's hands, as she could have had a weapon hidden elsewhere on her person. Notably, there is no dispute that Irmiter trained his gun on Kain as he advanced up the stairs, belying the suggestion that he did not feel threatened by her. (Irmiter Dep. at 35; Kain Dep. at 39-40.) As Justice (then-Judge) Alito once observed, police officers are not required to "banish all fear" if, upon entering a suspect's home, they encounter "a pastoral scene of . . . people sitting peaceably in a parlor." Mellott v. Heemer, 161 F.3d 117, 124 (3d Cir. 1998).

Finally, Kain argues that Irmiter's response to her "resistance" creates a jury question on excessive force, citing Rohrbough v. Hall, 586 F.3d 582 (8th Cir. 2009). (See Pl. Mem. at 11-12.) But Rohrbough presented markedly different facts. There, the plaintiff complied with all of the officer's commands, but the officer pushed the plaintiff

anyway. When the plaintiff pushed back, the officer punched him, pushed him, took him to the ground, and then handcuffed him. The Eighth Circuit held that these facts were sufficient to create a jury question on excessive force. Id. at 585-86. Here, however, Kain indisputably failed to comply with the officers' repeated commands, and the "[r]efusal to comply with an officer's orders, when given an opportunity to do so, makes the officer's use of force more reasonable." Rushing v. Simpson, No. 4:08CV1338, 2009 WL 4825196, at *7 (E.D. Mo. Dec. 11, 2009); accord Wertish, 433 F.3d at 1066.

## CONCLUSION

The facts of this case, taken in the light most favorable to Kain, do not establish a constitutional violation. Accordingly, Defendants are entitled to qualified immunity on her Fourth-Amendment claims. Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 11) is **GRANTED** and Kain's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  February 28, 2011              s/Richard H. Kyle
                                      RICHARD H. KYLE
                                      United States District Judge